UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| SILVER STATE BROADCASTING, LLC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BEASLEY FM ACQUISITION, *et al.*,<br><br>Defendants. | Case No. 2:11-cv-01789-APG-CWH<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**<br><br>(Dkt. #202) |

This case arises out of the parties' disputes following their entry into an Asset Purchase Agreement ("APA") for two radio stations in Las Vegas, Nevada and other related agreements. Plaintiffs Silver State Broadcasting, LLC and Golden State Broadcasting, LLC assert claims against defendants Beasley FM Acquisition Corporation, Beasley Broadcasting of Nevada, LLC, WAEC License Limited Partnership, and KJUL License LLC based on the defendants' alleged breaches of the various agreements. The defendants assert counterclaims alleging Silver State is the breaching party. The defendants move to dismiss or for summary judgment on several claims in the Second Amended Complaint.[1]

I grant in part and deny in part the motion to dismiss or for summary judgment directed at the Second Amended Complaint. I deny as moot the motion for summary judgment on the defendants' counterclaims.

**II. ANALYSIS**

Summary judgment is appropriate if the pleadings, depositions, discovery responses, and affidavits demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A fact is material if it "might

---

[1] The defendants do not move to dismiss counts 2 and 3 of the Second Amended Complaint. Count 6 is directed only at defendant Michael Bergner. I have addressed Silver State's claim against Bergner separately.

affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to go beyond the pleadings and set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000). I view all evidence and reasonable inferences in the light most favorable to the non-moving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

**A. Contract Claims Based on the APA (counts 1 and 10)**

The Second Amended Complaint asserts two claims based on the APA: breach of contract (count 1) and breach of the covenant of good faith and fair dealing (count 10). The defendants argue that Silver State cannot maintain these claims because it assigned all of its rights under the APA to Exeter 1031 Exchange Services, LLC and has never obtained the rights back. Silver State responds that the assignment was done to facilitate the "legal fiction" of an investment property exchange under the internal revenue laws and regulations.

Silver State's side of the APA transaction was structured as a "1031 exchange": an investment property exchange under Internal Revenue Service regulation 26 C.F.R. § 1.1031. (Dkt. #202-9 at 21-22.) A 1031 exchange permits a taxpayer to avoid recognizing a taxable gain or loss if it engages in a like-kind exchange of investment property within a certain period of time. 26 C.F.R. § 1.1031(a)-1(a). Typically, the taxpayer, or "exchanger," sells investment property and has a certain number of days to close on the purchase of replacement property. *See McHale v. Silicon Valley Law Grp.*, 919 F. Supp. 2d 1045, 1046-47 (N.D. Cal. 2013).

To avoid having to pay capital gains taxes on the sale of the property, the exchanger may not take possession of the sale proceeds. *Id.* When the taxpayer's transfer and receipt of like-kind

properties are not executed simultaneously, the taxpayer may use a qualified intermediary to facilitate a deferred exchange. 26 C.F.R. § 1.1031(k)-1(k). This is accomplished through a written exchange agreement between the taxpayer and the qualified intermediary pursuant to which the qualified intermediary acquires the relinquished property from the taxpayer, transfers the relinquished property, acquires like-kind replacement property, and transfers the replacement property to the taxpayer. 26 C.F.R. § 1.1031(k)-1(g)(4)(iii).

"In such a case, the taxpayer's transfer of relinquished property and subsequent receipt of like-kind replacement property is treated as an exchange, and the determination of whether the taxpayer is in actual or constructive receipt of money or other property before the taxpayer actually receives like-kind replacement property is made as if the qualified intermediary is not the agent of the taxpayer." *San Francisco Residence Club, Inc. v. Baswell-Guthrie*, 897 F. Supp. 2d 1122, 1134 (N.D. Ala. 2012) (citing 26 C.F.R. § 1.1031(k)–1(g)(4)(i)).

> Stated differently, in order to preserve the legal fiction of an 'exchange,' the exchanger cannot directly receive money when transferring the relinquished property to the qualified intermediary for sale. Instead, the qualified intermediary holds the funds derived from the sale of the relinquished property until the closing on the acquisition of the replacement property. At that time, the qualified intermediary delivers to the seller of the replacement property the funds used to purchase that property, and then transfers to the taxpayer-exchanger title to the replacement property. Such transactions have been approved as a valid means of effecting an 'exchange' of property for the purposes of favorable tax treatment under Section 1031.

*Id.* A qualified intermediary "is treated as acquiring and transferring replacement property if the intermediary (either on its own behalf or as the agent of any party to the transaction) enters into an agreement with the owner of the replacement property for the transfer of that property and, pursuant to that agreement, the replacement property is transferred to the taxpayer." 26 C.F.R. § 1.1031(k)-1(g)(4)(iv)(C).

Here, prior to closing on the APA, Silver State[2] purportedly assigned all right, title, and interest (but not obligations) under the APA to Exeter 1031 Exchange Services, LLC ("Exeter")

---

[2] The assignment was made not by Silver State but by "Edward R. Stolz II, tr/as Royce International Broadcasting Co., who will acquire as Silver State Broadcasting LLC." (Dkt. #202-

pursuant to a Tax-Deferred Exchange Agreement. (Dkt. #202-8 at 6-7; Dkt. #202-9 at 22; Dkt. #202-10 at 6.) Exeter did not assign back to Silver State title to the replacement property nor any rights under the APA. (Dkt. #202-11.)

Thus, although there is evidence that Silver State intended to structure the APA transaction as a 1031 exchange, there is no evidence that Exeter ever completed the exchange by actually transferring the right, title, and interest under the APA to Silver State. Silver State contends that upon the close of the sale, the qualified intermediary's function terminates and title is transferred to the exchanger. But stating how a 1031 exchange is supposed to be accomplished does not raise an issue of fact that the exchange was actually completed in this case. Silver State presents no evidence that Exeter transferred the APA rights back to Silver State or that the exchange agreement provided for automatic transfer upon closing. Rather, the only evidence before me shows Exeter, rather than Silver State, holds the rights under the APA.

Absent evidence that Exeter assigned its rights in the APA to Silver State, Silver State is not the real party in interest and it lacks standing to enforce the rights and interests under the APA. *See Peck v. Dodds*, 10 Nev. 204, 207 (Nev. 1875) ("There can be no doubt that so long as this assignment remained in force the right to sue on all accounts embraced by it was vested in the assignees exclusively as the real parties in interest."). Silver State offers no other arguments or evidence as to why it has standing to enforce the APA. I therefore grant the defendants' summary judgment motion on counts 1 and 10 (to the extent count 10 rests on the APA).

**B. Contract Claims Based on the Sales Marketing Agreement (counts 4 and 10)**

Counts 4 and 10 allege that the defendants breached a Sales Marketing Agreement ("SMA")—and the covenant of good faith implied therein—that had been entered into by Silver State and the defendants. (Dkt. #195 at 12-13, 18-19.) The title to count 4 states that it is being asserted on behalf of both Silver State and Golden State. (*Id.* at 12.) The defendants argue that Golden State was not a party to the SMA and could not have entered into the SMA because it was

---

10 at 6-8.) It is unclear why Royce was involved and whether these transactions resulted in a valid like-kind exchange for tax purposes, but that issue is not before me.

Page 4 of 12

not a legally formed entity until after the SMA was terminated. The plaintiffs do not respond to that argument and the Second Amended Complaint contains no allegation that Golden State was a party to the SMA. Thus, Golden State's claim in count 4 related to the SMA is dismissed. LR 7-2(d).

Silver State contends that the defendants breached the SMA by selling advertising time for below-market rates, failing to turn over collected revenues to Silver State, and failing to account to Silver State for revenues collected. (Dkt. #195 at 13, ¶ 86.) Silver State also alleges that the defendants breached the covenant of good faith and fair dealing implied in this agreement. (*Id.* at 18-19.)

The defendants argue that the SMA is unenforceable because it was not in writing as required under a federal regulation. According to the defendants, if the law requires a contract be in writing, the contract is invalid until that is accomplished. The defendants also argue there is no evidence Silver State provided any consideration to the defendants for the contract. Instead, the defendants contend, the agreement was between Silver State and the defendants' salespersons as independent contractors.

Silver State responds that the federal regulation does not apply because the SMA was a temporary arrangement that required the defendants to do more than sell advertising time. It also argues the defendants rely on *dicta* for the proposition that a contract that is statutorily required to be in writing is void until that is accomplished. Silver State also contends it gave consideration to the defendants because the SMA was an extension of the APA and the SMA was a contract with the defendants, not with the salespersons.

Issues of fact remain as to whether the SMA was a contract with the defendants or with the individual salespersons as independent contractors and whether it was supported by consideration. (*See, e.g.,* Dkt. #202-2 at 16, 36; Dkt. #202-9 at 9, 13; Dkt. #202-12 at 5.)

With regard to whether the SMA had to be written, 47 C.F.R. § 73.3555(k)(1) requires that "[w]here two radio stations are both located in the same market . . . , and a party . . . with a cognizable interest in one such station sells more than 15 percent of the advertising time per week

of the other such station, that party shall be treated as if it has an interest in the brokered station . . . ." Such an agreement between the two stations is called a Joint Sales Agreement. 47 C.F.R. § 73.3555(k). The purpose of this regulation is to ensure compliance with § 73.3555(a)(1), which limits the number of radio stations in a given market in which a person may have an interest. Under § 73.3555(k)(3),

> Every joint sales agreement of the type described in this Note shall be undertaken only pursuant to a signed written agreement that shall contain a certification by the licensee or permittee of the brokered station verifying that it maintains ultimate control over the station's facilities, including, specifically, control over station finances, personnel and programming, and by the brokering station that the agreement complies with the limitations set forth in . . . paragraphs (a), (c), and (d) of this section if the brokering station is a radio station.

It is undisputed that the SMA was not documented in a signed written agreement. (Dkt. #202-9 at 10-12.) Silver State contends that the SMA was not required to be in writing under this regulation because it was temporary and imposed more duties on the defendants than just selling advertising time. Silver State offers no authority for the proposition that a temporary agreement is not subject to the regulation, and there is no basis in the regulation to suggest a temporary arrangement is excluded from its coverage. Similarly, Silver State offers no authority for its argument that if the agreement imposes more duties on the broker than selling advertising, then the agreement does not fall within this regulation. There is no basis in the regulation for that interpretation and it would be contrary to the regulation's purpose. A broker owing greater obligations to the brokered station would be more indicative of an ownership interest for purposes of the ownership limitations in § 73.3555(a)(1), not less. Consequently, the SMA was required to be in writing under 47 C.F.R. § 73.3555(k)(3).

Silver State disputes whether that renders the SMA unenforceable. The defendants cite to *Dacanay v. Mendoza* for the proposition that "when a statute requires that a certain kind of contract be in writing, the enforceability of an oral contract is suspended until it is put to paper. Meanwhile, the contract is invalid." 573 F.2d 1075, 1080 (9th Cir. 1978). As Silver State points out, this statement was *dicta* in *Dacanay* because the case did not involve a contract required by statute to be in writing. Moreover, the defendants do not explain why they cite to federal law, as

opposed to Nevada law, on whether the contract is nevertheless enforceable between the parties even if the failure to reduce it to writing does not comply with a federal regulation, particularly where the parties have partially performed the contract. The defendants therefore have failed to meet their initial burden under Rule 56 of establishing they are entitled to judgment as a matter of law on these claims. I deny their motion as to counts 4 and 10 (to the extent count 10 rests on the SMA) with respect to Silver State.

### C. Intentional Interference with Contractual Relations (count 5)

The Second Amended Complaint alleges the defendants interfered with contracts between the plaintiffs and a national advertising representative, Christal Radio. The defendants argue that these contracts were terminated solely because Silver State and Golden State failed to pay Christal commissions as required under the agreements. The plaintiffs respond that genuine issues of material fact remain as to whether Bill Davis, a Beasley employee, sent emails to Christal aimed at undermining the plaintiffs' relationship with Christal.

No genuine issue of material fact remains that the Christal contracts were terminated because Silver State and Golden State did not pay commissions. Steven Sarantos, senior vice-president and director of sales for Christal Radio on the West Coast, testified that Silver State's contract with Christal's parent company, Katz Media, was terminated because Silver State failed to pay commissions. (Dkt. #202-18; Dkt. #202-19 at 6-9; Dkt. #202-20.) Sarantos denied that the defendants did anything to cause Katz to terminate the agreements. (Dkt. #202-19 at 8.) Similarly, the Golden State contract was terminated because Golden State failed to pay commissions. (Dkt. #202-16 at 8-10; Dkt. #202-18.)

The plaintiffs present no admissible evidence in response. The plaintiffs refer to exhibits 22 and 23, which purportedly reference emails from Beasley employee Bill Davis to Sarantos that disparage the plaintiffs. Exhibit 22 appears to be an email from Ed Stolz to Caroline Beasley stating that Bill Davis has been telling Sarantos that Silver State is not timely invoicing its clients. (Dkt. #210-33.) Attached to Stolz's email is an email allegedly sent from Bill Davis to Sarantos which forwards another email between other individuals requesting invoices from the prior

1 | month. (*Id.*) Exhibit 23 appears to be an email string requesting invoices from the prior month.
2 | (Dkt. #210-24.) Davis purportedly forwarded these messages to Sarantos. (*Id.*)

3 | Neither of these exhibits is authenticated. I therefore cannot consider them. *Orr v. Bank
4 | of Am.*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in
5 | ruling on a motion for summary judgment."). The plaintiffs present no other evidence raising an
6 | issue of fact that the Katz/Christal contracts were terminated for any reason other than that the
7 | plaintiffs did not pay commissions. The defendants therefore are entitled to summary judgment
8 | on count 5.

### D. Intentional Interference with Prospective Business Advantage (count 7)

10 | The Second Amended Complaint alleges that the defendants knew about and intentionally
11 | interfered with a prospective business relationship between Silver State and the seller of two radio
12 | stations, KOAS and KVGS. The defendants argue in their motion that there is no evidence they
13 | knew Silver State wanted to buy the two stations or that the defendants intended to harm Silver
14 | State when Beasley purchased the stations through a silent auction.

15 | Silver State does not respond to this argument, so it consents to dismissal of this claim.
16 | LR 7-2(d). Further, the defendants present evidence they did not know Silver State was interested
17 | in purchasing the radio stations. (Dkt. #202-23 at 3-5). Defendants' lack of knowledge about the
18 | relationship is fatal to Silver State's claim. *Las Vegas-Tonopah-Reno Stage Lines v. Gray Line
19 | Tours*, 792 P.2d 386, 388 (Nev. 1990) (listing "the defendant's knowledge of this prospective
20 | relationship" as an element of an intentional interference claim). Silver State presents no contrary
21 | evidence to raise an issue of fact on this claim. The defendants therefore are entitled to summary
22 | judgment on count 7.

### E. Negligent and Intentional Misrepresentation (counts 8 and 9)

24 | The Second Amended Complaint alleges that during the negotiation of the APA, the
25 | defendants misrepresented to Silver State that (1) a radio tower was located where the FCC
26 | licenses showed it was located, (2) that other FCC licenses correctly identified the location and
27 | direction Silver State was entitled to transmit, and (3) the equipment and intellectual property

licenses purchased in the sale were fully operational. The defendants argue that Silver State was not a legally formed entity at the time the alleged misrepresentations were made and, as a non-existent entity, Silver State could not have relied on any representations.[3] The defendants also argue that any claims related to the APA are barred by the indemnification provision in the APA because Silver State failed to give timely notice of the alleged misrepresentations. Although I previously ruled that the indemnification provision did not bar Silver State's claims, the defendants request I reconsider that ruling.

Silver State responds that it was a legally formed entity by the time of closing and any misrepresentations were made to Silver State's promoter, Ed Stolz. As for the indemnification provision, Silver State argues that it does not seek indemnification and that breaches between the parties are governed by another provision in the APA. Alternatively, Silver State argues it advised the defendants of the various breaches within the requisite one year period.

### 1. Silver State's Legal Status

The parties[4] executed the APA on May 27, 2009. (Dkt. #202-6 at 2.) Silver State filed its articles of organization on July 8, 2009. (Dkt. #202-3 at 3.) While Silver State was not a legally formed entity at the time the APA was executed, it was by the time the parties closed on the APA on August 25, 2009. (Dkt. #202-11 at 6.)

"Only a party to a contract can breach it." *Henderson Apt. Venture v. Miller*, No. 2:09-cv-01849-HDM-PAL, 2012 WL 2780058, at *5 (D. Nev. July 9, 2012). "A non-existent corporation does not have the legal capacity to contract." *Id.* However, "[u]nder Nevada law, if a pre-

---

[3] The defendants also argue, as discussed above, that Silver State lacks standing to enforce the APA because it transferred its rights to Exeter. However, with respect to the misrepresentation claims, Silver State is not seeking to enforce rights in the APA. Rather, it is arguing that it suffered damages by entering into the APA based on the defendants' misrepresentations. Although Silver State transferred its rights in the APA, it retained its obligations under the APA. (Dkt. #202-8 at 6-7; Dkt. #202-9 at 22; Dkt. #202-10 at 6.) Thus, Silver State has standing to argue that it was damaged by incurring obligations under the APA based on the defendants' alleged misrepresentations.

[4] The parties to the APA are plaintiff Silver State and defendants Beasley FM Acquisition Corporation, Beasley Broadcasting of Nevada, WAEC License Limited Partnership, and KJUL License.

incorporation contract made by a promoter is within the corporate powers, the corporation may, when organized, expressly or impliedly ratify the contract and, thus, make it a valid obligation of the corporation." *Jacobson v. Stern*, 605 P.2d 198, 201 (Nev. 1980); *see also Lorenz v. Beltio, Ltd.*, 963 P.2d 488, 495 n.7 (Nev. 1998) (rejecting the argument that a company could not have acquired an interest in an assigned lease prior to the time it was incorporated, because the corporation ratified the assignment after formation).

Here, genuine issues of material fact remain regarding whether Ed Stolz was Silver State's promoter at the time he negotiated and executed the APA and whether Silver State adopted the APA post-formation based on misrepresentations the defendants allegedly made to Stolz. Stolz signed the APA on Silver State's behalf and he is named as Silver State's manager in the articles of organization. (Dkt. #202-6 at 32; Dkt. #202-3 at 4.) Silver State was a legally formed entity when it adopted the contract at closing and then performed on the contract. Silver State therefore may assert claims for negligent and intentional misrepresentations made to it pre-formation. *See Hester Enters., Inc. v. Kale's Collision, Inc.*, No. 87C10294, 1990 WL43586, at *4 (N.D. Ill. Apr. 4, 1990) ("We find it natural that tortious misrepresentations made to the corporation's promoter before formation, on which the corporation was intended to rely in adopting the agreement (if the promoter was to be personally bound) or accepting the offer (if the promoter was not to be bound) can likewise cause legally cognizable and actionable injury to the corporation, even though the corporation did not yet exist."); *see also Warwick Dev. Co. v. GV Corp.*, 469 So. 2d 1270, 1276 (Ala. 1985) (stating that a corporation may assert a claim for fraudulent misrepresentations made to a promoter pre-formation) (citing 18 C.J.S. Corporations § 123 (1939)). A reasonable jury could find that Silver State is the proper entity to assert these claims. I therefore deny the defendants' motion on this issue.

### 2. Indemnification Provision

Article 10 of the APA provides for the parties to indemnify each other under certain circumstances. (Dkt. #202-6 at 20-21.) The indemnification provision requires that the party seeking indemnification must give notice to the other party of the factual basis and amount of the

claim. (*Id.* at 21.)  Additionally, the party making a claim must wait until the aggregate amount sought exceeds $25,000 and must give the notice within one year from the closing date. (*Id.* at 22-23.)

The indemnification provision states that "No claim may be brought under this Agreement unless written notice describing in reasonable detail the nature and basis of such claim is given on or prior to the last day of the Survival Period," meaning one year after the closing date. (*Id.*)  The indemnification provision further provides that "After the Closing, subject to Section 12.1, the right to indemnification under this Article 10 shall be the exclusive remedy of any party in connection with any breach or default by another party under this Agreement." (Dkt. #202-6 at 23.)

Although the APA does not contain a "Section 12.1," the first paragraph of Article 12 provides a remedy if the Seller (meaning the defendants) breaches or defaults:

> If Seller breaches or defaults in its obligations under this Agreement, Buyer may pursue any legal or equitable remedies available to it and shall be entitled to obtain from Seller court costs and reasonable attorneys' fees and expenses incurred by it in enforcing its rights hereunder in accordance with Section 13.7.  Seller recognizes that, in the event Seller defaults in the performance of its obligations under this Agreement, monetary damages alone will not be adequate.  In such event, Buyer shall be entitled to obtain specific performance of the terms of this Agreement. . . . .

(Dkt. #202-6 at 24.)

Under Nevada law, when the facts are not in dispute, contract interpretation is a question of law. *Lehrer McGovern Bovis, Inc. v. Bullock Insulation, Inc.*, 197 P.3d 1032, 1041 (Nev. 2008).  Generally, I construe unambiguous contracts according to their plain language. *Sheehan & Sheehan v. Nelson Malley & Co.*, 117 P.3d 219, 223-24 (Nev. 2005).  A contract is ambiguous if it is subject to more than one reasonable interpretation. *Anvui, LLC v. G.L. Dragon, LLC*, 163 P.3d 405, 407 (Nev. 2007).  When interpreting a contract, "the court shall effectuate the intent of the parties, which may be determined in light of the surrounding circumstances if not clear from the contract itself." *Sheehan*, 117 P.3d at 224 (quotation omitted). "The parties' intentions regarding a contractual provision present a question of fact." *Anvui, LLC*, 163 P.3d at 407.

As I previously ruled, the indemnification provision refers to indemnification obligations and claims seeking indemnification, not claims for breach of contract. (Dkt. #35 at 7; Dkt. #202-6 at 20 (Article 10 states the "Seller shall indemnify, defend, and hold harmless Buyer . . . .") Additionally, Article 10 states it is the exclusive remedy "subject to Article 12.1," which addresses breach of contract claims. (Dkt. #202-6 at 23-24.) Article 12 permits Silver State to "pursue any legal or equitable remedies available to it" if the Seller "breaches or defaults in its obligations" under the APA. (*Id.* at 24.) I find no basis to reconsider my prior ruling. *See Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) (stating reconsideration is appropriate if there is (1) newly discovered evidence, (2) an intervening change in the law, or (3) clear error or manifest injustice). And even if the contract is ambiguous, the defendants have not produced evidence to show there is no issue of fact that the parties intended the indemnification provision to control all claims between the parties. I therefore deny the defendants' motion to the extent it argues Silver State's claims are time-barred or otherwise defective under the indemnification provision.

## III. CONCLUSION

IT IS THEREFORE ORDERED that the defendants' motion to dismiss or for summary judgment **(Dkt. #202) is GRANTED in part and DENIED in part as set forth above**. The motion is granted as to counts 1, 4 (as to Golden State only), 5, 7, and 10 (in part). The motion is denied in all other respects. Thus, the counts remaining for trial are counts 2, 3, 4 (as to Silver State only), 6, 8, 9, and 10 (only as to Silver State's claim related to the SMA and sublease).

DATED this 3rd day of December, 2015.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE